DANIEL M. PETROCELLI (S.B. #97802)
  dpetrocelli@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
DREW E. BREUDER (S.B. #198466)
  dbreuder@omm.com
PATRICK S. MCNALLY (S.B. #302062)
  pmcnally@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Defendant
Sirius XM Radio Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INFOSTREAM GROUP, INC., a Nevada corporation,,<br><br>Plaintiff,<br><br>v.<br><br>SIRIUS XM RADIO INC., a Delaware corporation,<br><br>Defendant. | Case No. 8:17-CV-00253-DOC (KES)<br><br>Hon. David O. Carter<br><br>**DEFENDANT SIRIUS XM RADIO INC.'S NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO THE CALIFORNIA ANTI-SLAPP STATUTE, CODE OF CIVIL PROCEDURE SECTION 425.16, OR ALTERNATIVELY TO STAY ALL PROCEEDINGS PENDING APPEAL**<br><br>[DECLARATION OF BETTE ROCKMORE; DECLARATION OF PATRICK MCNALLY; REQUEST FOR JUDICIAL NOTICE; AND [PROPOSED] ORDER filed concurrently herewith]<br><br>Hearing Date:  May 22, 2017<br>Hearing Time:  8:30 a.m.<br>Courtroom:  9D |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 22, 2017 at 8:30 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable David O. Carter, Judge of the United States District Court for the Central District of California (Courtroom 9D), located at 411 West Fourth Street, Santa Ana, CA, 92701, defendant Sirius XM Radio Inc. ("Sirius XM") will and hereby does respectfully move the Court for an order striking plaintiff InfoStream Group, Inc.'s ("plaintiff" or "InfoStream") first amended complaint (Doc. 15, the "FAC") pursuant to the California Anti-SLAPP statute, Code of Civil Procedure Section 425.16 or, alternatively, for an order staying all proceedings pending Sirius XM's appeal of the Court's ruling on the instant motion.

InfoStream asserts in the FAC that Sirius XM has breached the implied covenant of good faith and fair dealing by refusing to broadcast satellite radio advertisements for InfoStream's controversial "SeekingArrangement.com," "WhatsYourPrice.com," and other "pay to date" websites. As explained in this Motion, however, Sirius XM's decisions about what advertisements it chooses to broadcast (and not broadcast) directly implicate its right of free speech in connection with a public issue. Moreover, InfoStream cannot demonstrate that it is reasonably likely to prevail on its implied covenant claim because no operative contract exists between the parties. The parties' advertising agreements expired years ago, Sirius XM fully performed under those agreements, and absent any underlying contract, Sirius XM cannot have breached the implied covenant as a matter of law. Accordingly, the Court should strike InfoStream's FAC pursuant to the anti-SLAPP statute on the grounds that it seeks to chill the valid exercise of Sirius XM's constitutional right of freedom of speech.

1    This Motion is based on this Notice of Motion and the accompanying

2    Memorandum of Points and Authorities; the concurrently filed Declaration of Bette

3    Rockmore ("Rockmore Decl.") and exhibits attached thereto; the concurrently filed

4    Declaration of Alice McNamara ("McNamara Decl.") and exhibits attached thereto;

5    the concurrently filed Declaration of Patrick McNally ("McNally Decl.") and

6    exhibits attached thereto; the concurrently filed Request for Judicial Notice

7    ("RFJN"); the concurrently filed [Proposed] Order; and such additional

8    submissions, evidence, and argument, including any reply briefing, as may be

9    presented at or before the hearing on this Motion.

10    This Motion is made following the conference of counsel pursuant to Local

11    Rule 7-3, which took place on April 10, 11, and 14, 2017. *See* McNally Decl. ¶ 2.

12

13    Dated:  April 24, 2017            O'MELVENY & MYERS LLP

14                                     By:   /s/ Daniel M. Petrocelli

15                                           Daniel M. Petrocelli
                                       Attorneys for Sirius XM Radio Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES.............................................. 1

I.    STATEMENT OF FACTS................................................................................ 2

    A.    The Parties.............................................................................................. 2

    B.    The Advertising Agreements ................................................................. 4

    C.    Sirius XM Adopts New Standards and Practices for Advertisers ......... 6

    D.    InfoStream Files Suit ............................................................................ 8

II.   LEGAL STANDARD .................................................................................... 8

III.  THE COURT SHOULD STRIKE INFOSTREAM'S FAC. ....................... 10

    A.    The Anti-SLAPP Statute Protects Sirius XM. .................................... 10

        1.    Sirius XM's Decision to Not Broadcast InfoStream's
            Advertisements Constitutes Protected Speech. ......................... 10

        2.    InfoStream's Websites Involve Matters of Public Interest. ...... 13

    B.    InfoStream Cannot Establish A Reasonable Probability of
        Prevailing On Its Breach of the Implied Covenant Claim. .................. 19

IV.   ALTERNATIVELY, THE COURT SHOULD STAY THIS CASE. ........... 25

V.    CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agosta v. Astor*,
  120 Cal. App. 4th 596 (2004) .................................................................22

*Averill v. Superior Court*,
  42 Cal. App. 4th 1170 (1996) ...............................................................13

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ...............................................................25

*BFGC Architects Planners, Inc. v. Forcum/Mackey Constr., Inc.*,
  119 Cal. App. 4th 848 (2004) ...............................................................23

*Bionghi v. Metro. Water Dist. of So. Cal.*,
  70 Cal. App. 4th 1358 (1999) ...............................................................23

*Cardenas v. McLane Foodservice, Inc.*,
  2011 WL 13133939 (C.D. Cal. Mar. 16, 2011) .....................................10

*Charpentier v. Los Angeles Rams Football Co. Inc.*,
  75 Cal. App. 4th 301 (1999) .................................................................21

*Church of Scientology v. Wollersheim*,
  42 Cal. App. 4th 628 (1996) .................................................................19

*DC Comics v. Pac. Pictures Corp.*,
  706 F.3d 1009 (9th Cir. 2013) ...............................................................25

*Dowling v. Zimmerman*,
  85 Cal. App. 4th 1400 (2001) .................................................................9

*FCC v. Midwest Video Corp.*,
  440 U.S. 689 (1979) ...............................................................................22

*Fox Searchlight Pictures, Inc. v. Paladino*,
  89 Cal. App. 4th 294 (2011) ...................................................................9

*Future Ads LLC v. Gillman*,
  2014 U.S. Dist. LEXIS 40398 (C.D. Cal. Mar. 24, 2014) .....................25

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

3

4

*Gerawan Farming, Inc. v. Lyons,*
    24 Cal. 4th 468 (2000)......................................................................12

5

6

*Global Telemedia Intl., Inc. v. Doe 1,*
    132 F. Supp. 2d 1261 (C.D. Cal. 2001)...........................................9, 19

7

8

*Greater New Orleans Broad. Ass'n v. U.S.,*
    527 U.S. 173 (1999) .......................................................................10

9

*Guz v. Bechtel Nat. Inc.,*
    24 Cal. 4th 317 (2000)......................................................................23

10

11

*Hibu Inc. v. Lawrence,*
    2013 WL 6190538 (C.D. Cal. Nov. 25, 2013) ...................................22

12

13

*Hilton v. Hallmark Cards,*
    599 F.3d 894 (9th Cir. 2009) ...........................................................9

14

15

*HMS Capital, Inc. v. Lawyers Title Co.,*
    12 Cal. Rptr. 3d 786 (2004)...........................................................10

16

17

*Hodges v. Apple, Inc.,*
    640 Fed. Appx. 687 (9th Cir. 2016) ................................................20

18

19

*Ingels v. Westwood One Broadcasting Services, Inc.,*
    129 Cal. App. 4th 1050 (2005)........................................................19

20

21

*Kaliterna v. Wright,*
    94 Cal. App. 2d 926 (1949).............................................................20

22

*Koehrer v. Superior Court,*
    181 Cal. App. 3d 1155 (1986)..........................................................23

23

24

*Liberman v. KCOP Television, Inc.,*
    110 Cal. App. 4th 156 (2003)..........................................................12

25

26

*Makaeff v. Trump Univ., LLC,*
    715 F.3d 254 (9th Cir. 2013)...........................................................9

27

28

*Makaeff v. Trump University, LLC,*
    2011 WL 613571 (S.D. Cal. Feb. 11, 2011) ....................................25

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

1

2

## TABLE OF AUTHORITIES
### (continued)

Page(s)

3

4

*Martinez v. Metabolife Int'l, Inc.*,
    113 Cal. App. 4th 181 (2003) ................................................................. 9

5

6

*McGarry v. Univ. of San Diego*,
    154 Cal. App. 4th 97 (2007) ................................................................. 19

7

8

*Mindys Cosmetics, Inc. v. Dakar*,
    611 F.3d 590 (9th Cir. 2010) ............................................................... 10

9

*Nygard, Inc. v. Uusi-Kerttula*,
    159 Cal. App. 4th 1027 (2008) ................................................... 9, 13, 22

10

11

*Pacific Gas & Elec. Co. v. Public Util. Comm'n*,
    475 U.S. 1 (1986) ................................................................................ 12

12

13

*People ex rel. Lockyer v. Brar*,
    115 Cal. App. 4th 1315 (2004) .............................................................. 8

14

15

*Progressive W. Ins. Co. v. Yolo Cnty. Super. Ct.*,
    135 Cal. App. 4th 263 (2005) ............................................................... 23

16

17

*Roe v. Doe*,
    2009 WL 1883752 (N.D. Cal. June 30, 2009) ............................... 10, 19

18

19

*Santandrea v. Siltec*,
    56 Cal. App. 3d 525 (1976) ................................................................. 21

20

21

*Seelig v. Infinity Broadcasting Corp.*,
    97 Cal. App. 4th 798 (2002) ................................................................ 13

22

*Simpson Strong-Tie Co. v. Gore*,
    162 Cal. App. 4th 737 (2008) ............................................................... 11

23

24

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010) ......................................................... 11, 12

25

26

*Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Group*,
    143 Cal. App. 4th 1036 (2006) ............................................................ 23

27

28

*U.S. ex rel Newsham v. Lockheed Missiles & Space Co., Inc.*,
    190 F.3d 963 (9th Cir. 1999) ................................................................. 9

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United of Omaha Life Ins. Co. v. Bukenya,*
   2013 WL 12120141 (C.D. Cal. Aug. 19, 2013) ....................................20

*Van Ness v. Blue Cross of California,*
   87 Cal. App. 4th 364 (2001) ...............................................................22

*Vess v. Ciba-Geigy Corp. USA,*
   317 F.3d 1097 (9th Cir. 2003) ...............................................................8

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer
   Council,*
   425 U.S. 748 (1976) ...........................................................................11

*Xin Liu v. Amway Corp.,*
   347 F.3d 1125 (9th Cir. 2003) .............................................................22

**Statutes**

47 U.S.C. § 153(11) ...................................................................................22

Cal. Bus. & Prof. Code § 17200 .................................................................8

Cal. Code Civ. Proc. § 425.16 ........................................................1, 2, 13

Cal. Code Civ. Proc. § 425.16(a) ...................................................8, 9, 13

Cal. Code Civ. Proc. § 425.16(b)(1) ...........................................................9

Cal. Code Civ. Proc. § 425.16(b)(2) ...........................................................9

Cal. Code Civ. Proc. § 425.16(c)(1) ...........................................................2

Cal. Code Civ. Proc. § 425.16(e) .............................................................13

Cal. Code Civ. Proc. § 425.16(i) ..............................................................25

**Other Authorities**

1 Witkin, Summary 10th Contracts § 847 (2005) .....................................21

23 FCC Rcd 12348 (2008)........................................................................22

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

## **MEMORANDUM OF POINTS AND AUTHORITIES**

This lawsuit is a direct attack on Sirius XM's constitutional right of freedom of speech, and was filed in retaliation for Sirius XM's lawful decision to decline airing radio advertisements for plaintiff's controversial "pay to date" websites. Sirius XM is a satellite radio broadcaster.  InfoStream is the self-described world's leading provider of online dating services connecting "sugar daddies"—older, often wealthy men—with "sugar babies"—typically younger women—in so-called "mutually beneficial relationships," in which the sugar daddy pays the sugar baby for dates and "companionship."  Ex. 13 (SeekingArrangement.com/how-it-works).[1] Not surprisingly, InfoStream and its dating websites have attracted significant public attention, controversy, and scrutiny.  Journalists from some of the most widely circulated and respected periodicals have referred to InfoStream's websites as "digitalized prostitution" and a "down-and-dirty marketplace where older moneyed men and cute young women engage in brutally frank transactions."  Exs. 22, 26.

For several years, Sirius XM broadcast radio advertisements for some of plaintiff's online dating websites pursuant to a series of short-term agreements with its advertising agency.  In the summer of 2014, however, and following expiration of the last of the parties' written contracts, Sirius XM notified InfoStream that it would no longer broadcast ads for its dating websites.  Two and a half years later, InfoStream filed this lawsuit in a brazen attempt to force Sirius XM to continue broadcasting the company's ads.

Fortunately, California law provides a remedy to quickly dispose of meritless lawsuits like this one.  California Code of Civil Procedure Section 425.16—also known as the "anti-SLAPP" statute—provides for a special motion to strike claims that threaten to chill the valid exercise of a litigant's right of free speech.  Here, the

---

[1] All exhibits are attached to the Rockmore Declaration, McNamara Declaration, or the McNally Declaration.

evidence clearly supports that InfoStream's lawsuit should be stricken.  First, Sirius XM's decision not to broadcast InfoStream's advertisements plainly constitutes an "act . . . in furtherance of its right of free speech" under the anti-SLAPP statute.  In addition, InfoStream's online dating websites have garnered widespread publicity, comment, and attention, and thus qualify on their face as a "public issue" under Code of Civil Procedure Section 425.16.

Moreover, InfoStream cannot establish that it is likely to prevail on the merits of its single claim for breach of the implied covenant of good faith and fair dealing.  As explained herein, Sirius XM fully performed under the parties' contracts, which expired years ago.  Absent a valid contract, InfoStream has no basis to claim breach of the implied covenant or seek damages.  The Court should grant Sirius XM's motion and strike InfoStream's complaint.[2]

## I.    STATEMENT OF FACTS

### A.    The Parties

InfoStream is a Nevada corporation based in Las Vegas and run by the company's founder and sole officer and director, Brandon Wey.[3]  Ex. 9 (Nevada Secretary of State records).  InfoStream "participates in the operation of several online dating websites" (FAC ¶ 10), including "WhatsYourPrice.com," "SeekingArrangement.com," and "SeekingMillionaire.com."  *See InfoStream Group, Inc. v. PayPal, Inc.*, Case No. 3:12-cv-00748 (N.D. Cal.), Doc. 1, Ex. A ¶ 6 (InfoStream admits it is "the registered owner and operator of" SeekingArrangement.com and WhatsYourPrice.com); Ex. 16 (https://www.seekingmillionaire.com/about-us); Ex. 31 (2/14/14 Vegasinc.com

---

[2] Sirius XM intends to seek an award of its attorneys' fees and costs if it prevails on this motion.  *See* Cal. Code Civ. Proc. § 425.16(c)(1).

[3] Mr. Wey often refers to himself as "Brandon Wade," a name he uses because he "wanted to sound a little more Hugh Hefner."  Ex. 23 (http://abcnews.go.com/Business/AheadoftheCurve/story?id=7578033&page=1); Ex. 30 (http://www.denverpost.com/2012/09/06/lewis-rich-nerds-need-lovin-too/).  For purposes of this motion, Sirius XM refers to Mr. Wey as Mr. Wade.

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

article).  As their names suggest, InfoStream's dating websites provide and
facilitate what it describes as "Mutually Beneficial Relationships" (FAC ¶ 15)
wherein members—typically, older wealthy men—pay to go on dates with young,
attractive persons.  *See* Ex. 31 (https://vegasinc.com/business/2014/feb/14/man-
behind-seekingmillionairecom-talks-love----and/) (noting the average male on
SeekingArrangement.com is 40 years old and earns $250,000 a year, while the
average female is 27).  For example,

- On WhatsYourPrice.com, InfoStream advertises that members can
  "Date Attractive Women.  Easily date the women of your dreams.
  Now you can date anyone, anywhere, anytime.  *Make your offer today
  and go on a first date tomorrow*."  Ex. 10
  (https://www.whatsyourprice.com/) (emphasis added).  The website
  prominently quotes from a *Time* article stating, "Have trouble landing
  a date?  If your pockets are deep, [WhatsYourPrice.com] allows its
  members to bid on attractive potential mates [and] might be up your
  alley."  The website also quotes from a *Daily Mail* article stating,
  "They say money can't buy you love, but [WhatsYourPrice] is
  planning to turn that old adage on its head."  *Id*.

- According to SeekingArrangement.com, it is "the leading Sugar
  Daddy dating site where over 10 million members fuel mutually
  beneficial relationships on their terms."  Ex. 11
  (https://www.seekingarrangement.com/).  As the website explains,
  "sugar babies" can "enjoy a life of luxury by being pampered with fine
  dinners, exotic trips and allowances" and "[u]npaid bills no longer
  have to be a concern."  Ex. 12
  (https://www.seekingarrangement.com/about-us/); Ex. 11
  (https://www.seekingarrangement.com/).  In turn, "Sugar Daddies . . .
  find beautiful members to accompany them at all times" and can

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

expect "[u]pfront and honest arrangements with someone who will cater to your needs."  Ex. 12 (https://www.seekingarrangement.com/about-us/); Ex. 11 (https://www.seekingarrangement.com/).

- On its SeekingMillionaire.com website, InfoStream boasts that it helps "aspiring women" find "successful men" who understand their "need for security."  Ex. 15 (https://www.seekingmillionaire.com/).

Sirius XM is a satellite and internet radio broadcaster based in New York. Rockmore Decl. ¶ 2; *see also* FAC ¶ 11.  Sirius XM broadcasts content across over a hundred digital radio channels to millions of paying subscribers around the United States, 24 hours a day, seven days a week.  Rockmore Decl. ¶ 2.  Although many of its music channels offer commercial-free programming, Sirius XM broadcasts advertisements on certain non-music channels.  *Id.*

### B.    The Advertising Agreements

Starting in 2011, RadioActive Media ("RadioActive") entered into several short-term agreements with Sirius XM wherein Sirius XM agreed to broadcast radio advertisements for certain of InfoStream's online dating websites for a limited amount of time—typically, four to six weeks.[4]  Rockmore Decl. ¶¶ 4-6; FAC ¶¶ 14-15.  The first agreement, entitled "Proposal" and dated September 30, 2011, provided that in exchange for approximately $50,000, Sirius XM would air hundreds of "What's Your Price" radio ads during the four-week period of October 10, 2011 (the "Start" date) through November 6, 2011 (the "End" date) on Sirius XM's MSNBC, CNN, Fox News, Howards Stern, OUTQ, and "Virus" radio channels.  Ex. 1 at pp. 5-7.  Notably, this document, like all the parties' subsequent agreements, required only that Sirius XM broadcast plaintiff's ads on the specific

---

[4] RadioActive was InfoStream's agent and entered into the advertising agreements with Sirius XM on InfoStream's behalf.  FAC ¶ 14.  InfoStream omitted to attach the agreements to its complaint, however.  For the Court's convenience, Sirius XM has submitted copies of the agreements with this motion.  *See* Exs. 1-3.

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

dates and channels identified in the contract, but did *not* require or obligate Sirius XM to continue to place InfoStream's ads after the "End" date set forth in the agreement. *Id.*; Rockmore Decl. ¶ 4.  Other than identifying the advertiser, dates of broadcast, radio channels, and price, the Proposal contained no other contractual terms.[5]  Following the "End" date specified in the Proposal, Sirius XM sent an "Invoice and Affidavit" itemizing in detail when and on what channels the InfoStream ads aired during the term of the agreement, and "attest[ing] to the fact that all spots aired as shown herein."  McNamara Decl. ¶¶ 4-5, Exs. 5-6.

Between September 2011 and May 2014, the parties entered into approximately 25 separate written agreements (collectively, the "Agreements"). Rockmore Decl. ¶ 5.  Like the original "Proposal," each of the Agreements contain specific terms identifying the advertiser, the product, the start and end dates of the contract, the channels on which the commercials were to air, and the price.  *Id.*; *see also* Exs. 2-3.  Importantly, none of the Agreements required that Sirius XM continue to provide advertising to InfoStream after expiration of their term. Consistent with its contractual obligations, Sirius XM broadcast all the InfoStream advertisements that it agreed to air under the Agreements, as reflected in each of the Invoices and Affidavits provided after expiration of the contracts.  McNamara Decl. ¶ 7, Exs. 5-8.  Sirius XM's final agreement with InfoStream expired on June 29, 2014.  Rockmore Decl. ¶ 6, Ex. 3.

---

[5] The only other substantive language in the agreement appears underneath the signature line, and states: "All spots ordered on the Howard Stern Channels 100, 101, The Virius [sic], all news Channels and Live Programming will be considered to have run as ordered so long as they air within the content of the programs.  Sirius XM reserves the right to run spots in comparable substitute programming in the event of a programming schedule change.  Sirius XM reserves all rights to air advertiser commercials on all signal delivery stream including satellite channels and mirrored web channels.  SXM is not obligated to air bonus spots and will air bonus spots based on inventory availability.  If SXM is unable to air no charge spots in specified programming, SXM will make their best effort to air no charge spots in like programming based on inventory availability.  All cancellations in accordance with SIRIUSXM cancellation policy [m]ust be in writing with a copy to:  SIRIUSXM Business Office 1221 Avenue of the America['s] NY[,] NY 10020 or [by email]."  Ex. 1 at p.7.

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

**C.**   **Sirius XM Adopts New Standards and Practices for Advertisers.**

In August 2014, months after expiration of the final Agreement and as part of a review of its business practices, Sirius XM promulgated an "Advertising Standards and Practices Guide" for its advertisers (the "Guide").  Rockmore Decl. ¶ 7, Ex. 4.  As the "Overview" section of the Guide explains, "Sirius XM is a publicly traded company, licensed by the FCC, with responsibilities to many constituencies, including its stockholders, its listeners, the public in general, the FCC, and its employees" and its "policies take into account the needs of each of these groups."  Ex. 4 at 1.  Accordingly, "[a]ll advertising messages should be prepared with proper consideration of the type of product being advertised, the time of broadcast, and the audience to whom the advertising is directed."  *Id.*  "Good taste, in keeping with prevailing norms which may differ by target audience, must always guide the content, placement, and presentation of announcements" and the company "consider[s] the ad's potential impact and whether the topic or its presentation might cause controversy . . . ."  *Id.*  The Guide further explains that Sirius XM strives to "present advertising that is truthful, respectful of the sensibility of our various target audiences and not misleading or deceptive," and to be "aware of the importance of respecting the sensibilities and values of all parts of the Sirius XM community."  *Id.*

In addition, the Guide makes clear that Sirius XM is *not* required to accept or broadcast material from any particular advertiser.  For instance, the Guide states that:

- Sirius XM "is not a common carrier, and is not obligated to accept any advertising; and may in its sole discretion determine not to air an ad, or to pull from its schedule an ad which has already begun its scheduled run."  Ex. 4 at 4.
- Sirius XM "reserves the right to [r]equire elimination or revision of any material in advertising copy with violates Sirius XM's standards,

6

1     policies, or guidelines . . . or which Sirius XM decides in its sole

2     discretion that the broadcast of the material is not in the best interests

3     of Sirius XM," and to "reject advertising where, in the view of Sirius

4     XM, the advertised product . . . or service . . . could negatively impact

5     Sirius XM or its audiences in any way." Ex. 4 at 2; *id*. at 4.

6    • Sirius XM "may decide to accept advertising for controversial issues

7     of public importance on a case-by-case basis" but advertisers "should

8     have no expectation that any 'issue' advertising will be accepted by

9     Sirius XM." *Id*. at 3. Moreover, Sirius XM "reserves the right to

10    make exceptions to the Guide and to accept, on a case-by-case basis,

11    lawful advertisements even though they may not comply with the

12    Guide, or to reject advertisements which may comply with the Guide."

13    *Id*. at 5.

14    The Guide also contains specific provisions for 35 different types of

15 advertisements, including ads for "Escort Services/Dating Services:"

16    Advertising for dating services and dating agencies is acceptable

17    where the advertising and the service advertised appear to be of

18    a non-sexual nature. *Sirius XM does not accept advertising for:*

19    *(1) "escort type" services where any person is compensated to*

20    *participate in the date, (2) services that discuss or suggest a*

21    *mutually beneficial relationship or anything alluding to*

22    *prostitution,* (3) sex chat lines or websites, or (4) dating services

23    targeted to persons who are under 18 years of age. *Sirius XM*

24    *may, in its sole discretion and with the approval of Sirius XM's*

25    *General Counsel, accept advertising for such products.*

26 Ex. 4 at 9 (emphasis added); *see also* FAC ¶ 20 (same).

27    Following adoption of the Guide, Sirius XM informed RadioActive in

28 August 2014 that it would not be entering into any new agreements and would no

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

1  longer broadcast ads for InfoStream's dating websites.  FAC ¶¶ 17-19; Rockmore
2  Decl. ¶ 7.

3       **D.**    **InfoStream Files Suit.**

4       Nearly two and a half years later, on January 6, 2017, InfoStream
5  commenced this action in Orange County, California Superior Court.  Doc. 1-1.  In
6  its original complaint, InfoStream alleged claims for breach of contract, breach of
7  the implied covenant of good faith and fair dealing, and violation of California
8  Business and Professions Code Section 17200 ("Section 17200").  *Id.*  On February
9  10, 2017, Sirius XM timely removed the case to this Court.  *Id.*  On March 17,
10  2017, Sirius XM filed its answer and affirmative defenses to the complaint.  Doc.
11  13.  On April 7, 2017, InfoStream filed its first amended complaint.  Doc. 15.
12  Although the FAC contains most of the same allegations pled in the initial
13  complaint, it only contains a single cause of action—for breach of the implied
14  covenant of good faith and fair dealing—and omits the breach of contract and
15  Section 17200 claims previously alleged by InfoStream.  *Id.*; *see also* Doc. 1-1.

16  **II.**    **LEGAL STANDARD**

17       The purpose of California's anti-SLAPP statute is to encourage "the
18  continued participation in matters of public significance" and to combat lawsuits
19  that "chill the valid exercise of . . . freedom of speech" through "abuse of the
20  judicial process."  Cal. Code Civ. Proc. § 425.16(a) (noting "there has been a
21  disturbing increase in lawsuits brought primarily to chill the valid exercise of the
22  constitutional rights of freedom of speech and petition for the redress of
23  grievances").[6]  Accordingly, causes of action arising from "any act . . . in
24  furtherance of [a defendant's] right of . . . free speech . . . in connection with a

---

25  [6] *See also People ex rel. Lockyer v. Brar,* 115 Cal. App. 4th 1315, 1317 (2004)
26  ("The point of the anti-SLAPP statute is that you have a right not to be dragged
through the courts because you exercised your constitutional rights."); *Vess v. Ciba-*
27  *Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003) (purpose of anti-SLAPP
statute is "to allow early dismissal of meritless first amendment cases aimed at
28  chilling expression through costly, time-consuming litigation").

public issue" may be stricken under the anti-SLAPP statute.  Cal. Code Civ. Proc. § 425.16(b)(1).  Courts, including federal courts sitting in diversity, are required to apply and construe the anti-SLAPP statute broadly to protect the rights of defendants.  *Id.* § 425.16(a); *see Dowling v. Zimmerman,* 85 Cal. App. 4th 1400, 1425 (2001) (noting the statute is meant "to provide a swift and effective remedy to SLAPP suit defendants"); *U.S. ex rel Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972 (9th Cir. 1999) (applying anti-SLAPP statute in diversity case because of its "important [and] substantive" legal protections); *Global Telemedia Intl., Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1265 n.3 (C.D. Cal. 2001) (Carter, J.) (same).  The anti-SLAPP statute can be used to strike a wide array of claims, including claims for breach of the implied covenant of good faith and fair dealing.  *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1039 (2008).

Courts engage in a two-step analysis in deciding whether to grant an anti-SLAPP motion.  *See Global Telemedia*, 132 F. Supp. 2d at 1265.  First, and as applied here, Sirius XM must make an initial prima facie showing that InfoStream's lawsuit arises from "speech" by Sirius XM in connection with a "public issue." *Fox Searchlight Pictures, Inc. v. Paladino*, 89 Cal. App. 4th 294, 306-07 (2011); *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2009) (defendant "must make its 'threshold showing' . . . 'that the act or acts of which the plaintiff complains were taken in furtherance of the [defendant's] right of . . . free speech . . . in connection with a public issue'").  To evaluate this showing, the Court must consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  Cal. Code Civ. Proc. § 425.16(b)(2); *Martinez v. Metabolife Int'l, Inc*., 113 Cal. App. 4th 181, 186 (2003).

Second, if Sirius XM makes the prima facie showing, the burden shifts to InfoStream to demonstrate a "reasonable probability that it will prevail on its claim[s] in order for [its] claim[s] to survive dismissal."  *Makaeff v. Trump Univ*., LLC, 715 F.3d 254, 261 (9th Cir. 2013).  InfoStream cannot simply rest on the

1    allegations in its complaint, however.  Rather, InfoStream "must demonstrate that
2    the complaint is both legally sufficient and supported by a sufficient prima facie
3    showing of facts to sustain a favorable judgment if the evidence submitted by the
4    plaintiff is credited."  *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 599 (9th Cir.
5    2010); *see also HMS Capital, Inc. v. Lawyers Title Co*., 12 Cal. Rptr. 3d 786, 791
6    (2004) (plaintiff "must produce evidence that would be admissible at trial").  "In
7    deciding the question of potential merit, the trial court considers the pleadings and
8    evidentiary submissions of both the plaintiff and the defendant."  *Roe v. Doe*, 2009
9    WL 1883752, at *7 (N.D. Cal. June 30, 2009).  The Court's evaluation is a
10   "summary judgment-like procedure," and dismissal of the complaint is mandated if
11   "no reasonable jury could find for" InfoStream.  *Cardenas v. McLane Foodservice,*
12   *Inc*., 2011 WL 13133939, at *6 (C.D. Cal. Mar. 16, 2011), *citing Mindys*
13   *Cosmetics*, 611 F.3d at 599.

14        As explained below, InfoStream's FAC clearly satisfies both prongs of the
15   anti-SLAPP statute, and must be stricken.

16   **III.   THE COURT SHOULD STRIKE INFOSTREAM'S FAC.**

17        **A.   The Anti-SLAPP Statute Protects Sirius XM.**

18            **1.   Sirius XM's Decision to Not Broadcast InfoStream's**
                 **Advertisements Constitutes Protected Speech.**
19
20        The gravamen of InfoStream's complaint is that Sirius XM breached the
21   implied covenant of good faith and fair dealing by deciding to "no longer broadcast
22   InfoStream's advertisements."  FAC ¶ 3.  But the broadcast of radio advertisements
23   is a classic form of speech protected by the First Amendment.  *See Greater New*
24   *Orleans Broad. Ass'n v. U.S.*, 527 U.S. 173, 176, 195-96 (1999) (holding that
25   FCC's prohibition on the radio broadcast of ads for private casino gambling in
26   certain states "violates the First Amendment").  As the Supreme Court has noted,
27   advertisements serve the "goal" of the First Amendment by contributing to
28   "intelligent" consumer decisions and ensuring the "free flow of commercial

information." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 765 (1976) (holding that statute proscribing the advertising of price information for prescription drugs was unconstitutional).  Nor does "speech . . . lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another."  *Id*. at 761.

Courts routinely strike claims involving advertising under California's anti-SLAPP statute.  For example, in *Simpson Strong-Tie Co. v. Gore*, 162 Cal. App. 4th 737 (2008), *aff'd* 49 Cal. 4th 12 (2010), a building products manufacturer brought defamation and false advertising claims against an attorney after the attorney placed newspaper ads advising readers that they may have legal claims against the manufacturer.  *Id.* at 743.  The ads were "used to solicit defendant's legal services," *id.* at 767, but the trial court nevertheless granted the attorney's anti-SLAPP motion, and the Court of Appeals affirmed.  *Id*.  The court rejected as "substantially overbroad" the view that the anti-SLAPP statute does not apply to "commercial speech" such as advertisements, *id.* at 750, and held that claims arising from the ad were "subject to scrutiny under the anti-SLAPP law."  *Id*. at 756, 758.

Similarly, in *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010), a group of musicians sued Rolling Stone magazine over a five-page feature that included advertisements for Camel cigarettes alongside photographs of the musicians.  The musicians alleged that Rolling Stone "used . . . [plaintiffs'] names . . . knowingly and deliberately for the commercial purpose of advertising Camel cigarettes."  *Id.* at 674.  Rolling Stone moved to strike the complaint, arguing the claims arose "from alleged conduct that involves Rolling Stone's exercise of its free speech rights about a matter of public interest."  The trial court denied the motion, but the appellate court reversed with instructions to grant the anti-SLAPP motion.  *Id.* at 670.  In particular, the appellate court rejected plaintiffs' argument "that the anti-SLAPP statute has no application to their complaint because . . . [it] does not protect commercial speech" such as advertisements, *id.* at 678, noting the

11

lack of "any authority" to support that proposition. *Id.* at 678. The court also found that the First Amendment's protections have "been extended *to the content* and placement of advertisements." *Id.* at 691 (emphasis added).[7]

Moreover, the First Amendment plainly protects not only Sirius XM's affirmative broadcast of radio advertisements, but also its decision *not* to air InfoStream's ads. In *Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468 (2000), a plum grower challenged a state marketing program that required California plum growers "to fund . . . advertising" about the benefits of California plums. *Id.* at 481. Plaintiff argued that the program's advertisements constituted "compelled speech" in violation of the United States and California constitutions because it forced the grower to subsidize ads that expressed a viewpoint "to which it d[id] not subscribe." *Id.* at 505. The California Supreme Court agreed:

> Because speech results from what a speaker chooses to say *and what he chooses not to say*, the right [to freedom of speech] comprises both a right to speak freely *and also a right to refrain from doing so at all,* and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say *and also by compelling him to say what he otherwise would not say*.

*Id.* at 486 (emphasis added).[8] *See also Pacific Gas & Elec. Co. v. Public Util. Comm'n*, 475 U.S. 1, 16 (1986) ("For corporations as for individuals, the choice to speak includes within it the choice of what not to say."); *cf. Liberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 166 (2003) (anti-SLAPP statute's definition of an "act" in furtherance of the right of free speech "is not restricted to speech"

---

[7] In addition, the court ruled that the anti-SLAPP statute applied because the five-page article was an "editorial" feature. *Id.* at 679.

[8] The court also held that California's Constitution offers "even broader and greater" protections for commercial speech than the U.S. Constitution, *id.* at 491, and grants commercial speech full protection so long as it is "truthful and nonmisleading." *Id.* at 496.

and extends to "all *conduct* in furtherance of the exercise of the right of free speech in connection with a public issue") (emphasis added).  Accordingly, Sirius XM's conduct qualifies as protected speech under California's anti-SLAPP statute.

### 2.    InfoStream's Websites Involve Matters of Public Interest.

Advertising concerning InfoStream's online dating websites also constitutes a matter of public interest.  Although the anti-SLAPP statute does not expressly define the term, courts have explained that "'an issue of public interest' within the meaning of [the anti-SLAPP statute] *is any issue in which the public is interested*.  In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." *Nygard*, 159 Cal. App. 4th at 1042 (emphasis in original).  "[T]his requirement, like all of section 425.16, is to be 'construed broadly' so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest."  *Seelig v. Infinity Broadcasting Corp.*, 97 Cal. App. 4th 798, 809 n.5 (2002) (citing Cal. Code Civ. Proc. § 425.16(a)).  *See also Averill v. Superior Court*, 42 Cal. App. 4th 1170, 1175-1176 (1996) (§ 425.16(e) is to be given broad application in light of its purposes).

Here, there is voluminous evidence confirming that the public is keenly interested in InfoStream's dating websites.  Since entering the "sugar daddy" industry in 2006, InfoStream and its founder, Mr. Wade, have intentionally solicited and attracted significant media attention, as reflected in the hundreds of articles and other media coverage concerning their controversial dating websites.[9]

InfoStream founder and CEO Brandon Wade.  A self-described "leading relationship expert," Mr. Wade has sought and received significant public attention for InfoStream, its websites, and his views on relationships.  For instance, on his

---

[9] Sirius XM can rely on news articles and similar evidence to establish that InfoStream's websites concern an issue of public interest. *See*, *e.g.*, *Seelig*, 97 Cal. App. 4th at 809 n.5 (taking judicial notice of articles discussing television show).

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

1   personal website, AskBrandonWade.com, Mr. Wade proudly proclaims that "Love

2   is a concept invented by poor people" and provides links to his many television

3   appearances, including on CNN, ABC's *20/20*, *The View*, *Nightline*, and other

4   nationally syndicated shows. Ex. 17 (http://www.askbrandonwade.com/); Ex. 18

5   (http://www.askbrandonwade.com/in-the-media/).  In addition, Mr. Wade's website

6   touts that he has "penned several books in an attempt to share my knowledge on the

7   sugar daddy and sugar baby lifestyle while breaking down stereotypes" (Ex. 17

8   (http://www.askbrandonwade.com/)), and provides links to purchase his three

9   books—*Seeking Arrangement: The Definitive Guide to Sugar Daddy and Mutually*

10  *Beneficial Arrangements*, *What's Your Price? The Online Dating Auction*, and

11  *Connecting with the "IN" Crowd. How to Network, Hang Out, and Play with*

12  *Millionaires Online*—on Amazon.com.  Ex. 19

13  (http://www.askbrandonwade.com/brandon-wade-author/).  Numerous press articles

14  have also been published concerning Mr. Wade, including a *Business Insider* story

15  which described him as a "master of PR and word-of-mouth marketing" who has

16  received significant news coverage because "editors can't resist his unapologetic

17  mix of sex and money."  Ex. 29 (Business Insider).  *See also* Exs. 23, 30.

18  Moreover, Mr. Wade has issued dozens of press releases concerning InfoStream

19  and his dating websites.  *See* Exs. 48-72 (press releases).

20       SeekingArrangement.com.  According to its website,

21  SeekingArrangement.com has more than 10 million active members in 139

22  countries seeking "mutually beneficial relationships," including more than 8 million

23  "sugar babies" and  more than 2 million "sugar daddies and mommas."  Ex. 12

24  (https://www.seekingarrangement.com/about-us/).  Not surprisingly,

25  SeekingArrangement.com has received significant press coverage.  On its website,

26  SeekingArrangement.com provides a list of and links to more than *400* domestic

27  and foreign news articles and press discussing its controversial business model.  *See*

28  Ex. 14 (https://www.seekingarrangement.com/press/).  Below are select quotes

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

from some of these articles.

- *The New York Times*: " . . . Seeking Arrangement is a down-and-dirty marketplace where older moneyed men and cute young women engage in brutally frank transactions. They're not searching for longtime soul mates; they want no-strings-attached 'arrangements' that trade in society's most valued currencies: wealth, youth and beauty . . . . Critics say it is at best a convenience store for adulterers and at worst a virtual brothel." Ex. 22.

- *The Atlantic Monthly*: "'Sugar babies are escorts,' said Tammy Castle, a professor at James Madison University whose research includes analyzing the content of escort websites. [The administrators of . . . . Seeking Arrangement] are trying to avoid the negative stigma of prostitution by advertising this as just another dating website, but money is exchanged for arrangements that may include sex." Ex. 38.

- *The Daily Mail*: SeekingArrangement.com is a "controversial way" for "savvy girls" to support themselves. Ex. 44. The article attracted over 1100 comments. *Id*.

- *GQ*: "SeekingArrangement is just one of several sugar-dating sites, but a popular one . . . . [I]n October 2014, Manhattan millionaire Paul Aronson, 85—85!—was left tied to his coffee table for twenty hours by 17-year-old twins he met through SeekingArrangement." Ex. 43.

- *Newsweek*: "Is sugar dating prostitution, or simply the latest incarnation of courtship? Supporters tout the financial, social and professional benefits young women reap by renting their companionship to older men . . . . Seeking Arrangement's official stance is that sex has no place in the kind of relationships it is selling . . . . Critics are sure it's prostitution. And most parents of a sugar baby can't comprehend it: sending their daughter off to college only to learn

15

she goes straight from biology lab or that Moby Dick seminar to dinner and whatever comes next with a man who could be her father." Ex. 37.

- *ABC 7 News (San Francisco)*:  "[SeekingArrangement.com] is connecting local men with young women for cash.  It's one of several websites out there now that has people 'seeking arrangements.' But is it safe?  Is it even legal?  It's attracting a lot of young people looking to make some quick cash."  Ex. 41.

SeekingArrangement.com has also prominently advertised its "sugar daddy" dating services in billboard campaigns, such as the following:



Ex. 33 (http://abcnews.go.com/Lifestyle/sugar-daddy-company-billboards-attract-babies/story?id=24109450).

Notably, SeekingArrangement.com caught the attention of the international media in late 2013 and 2014 after Alix Tichelman, a "high-end prostitute," murdered Forrest Hayes, a Google executive she met on the website, by injecting him with heroin on a yacht in Santa Cruz, California.  *See* Ex. 36 (*CNN*: "Yacht killing case shines light on 'sugar daddy' websites"); Ex. 42 (*Los Angeles Times*: "Tichelman and Hayes had reportedly met on . . . SeekingArrangement.com, and had maintained an 'ongoing prostitution relationship,' according to police."); Ex. 34 (*Washington Post*:  "Hayes and Tichelman met . . . through the Web site 'Seeking Arrangement,' which promises to help 'Sugar Babies and Sugar Daddies

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

or Mommas both get what they want, when they want it.").[10]  *See also* Exs. 45-47 (March and April 2017 articles regarding SeekingArrangment.com).

WhatsYourPrice.com.  WhatsYourPrice.com—another InfoStream website described as a platform for "[g]enerous" individuals to offer financial compensation to "[d]ate attractive women"— has also attracted widespread attention from the media and the public.  Ex. 10 (https://www.whatsyourprice.com/).  The following are excerpts from some of this press.

- *San Francisco Chronicle*:  According to Mr. Wade, InfoStream "knew [WhatsYourPrice.com] was going to cause an uproar—in fact, we counted on it. That's why we chose the name we did and the slogan, 'Everybody Has a Price'; controversy's the cheapest form of advertising you could possibly ask for."  Ex. 28.

- *Forbes*:  "[WhatsYourPrice.com] gained the attention of the media, [with] headlines . . . flooding the internet claiming the site was nothing more than digitalized prostitution at worst and at best it fosters a false sense of romantic affections."  Ex. 26.

- *Gawker*:  "The kindest thing you could say about the new dating site Whatsyourprice.com is that it is the perfect place for the world's laziest dudes and most cynical women to hook up. The least kind thing you could say is that it is mass-scale prostitution."  Ex. 24.

- *The Atlantic*:  "On WhatsYourPrice.com, a controversial new dating site, the typical user is a man who cruises profiles, selects a woman, and bids on a date. Say he offers $100. She can accept, decline, or

---

[10] Ex. 40 (*CBS News*:  According to Santa Cruz Deputy Police Chief, "[i]t doesn't take [] Sherlock Holmes to . . . look at [SeekingArrangement.com] and figure out exactly what was going on there . . . . The titles of the individuals are Sugar Babies and Sugar Daddies.  You know, that's-- there's no innocent connotation there behind any of that."); Ex. 35 (*San Francisco Chronicle*:  "[Police] said Tichelman 'works as a high-priced outcall prostitute and meets her clients through a website, 'Seeking Arrangement.'  During interviews, Ms. Tichelman boasted of over 200 client relationships.").

17

1   make a counteroffer. Critics say that this is 'indistinguishable from

2   prostitution.' The company's founder begs to differ." Ex. 27.

3   • *The Telegraph*: "It's hard to swallow the notion that traditional

4      romance lives on [with WhatsYourPrice.com,] whose tag line is: 'Get

5      the date by simply using your wallet." Ex. 32.

6   • *ABC News*: "[S]ome criticize the site as being prostitution for today's

7      digital age, [but Mr.] Wade said he's not an e-pimp." Ex. 39.

8   • *The Today Show*: "[WhatsYourPrice.com's] approach to dating seems

9      sleazy to most of us and . . . it feels like WhatsYourPrice.com treats its

10     members like prostitutes and clients." Ex. 25.

11  WhatsYourPrice.com's website also includes links to many other press articles and

12  videos about its business, spanning from April 2011 up through February 2017.  Ex.

13  10 (https://www.whatsyourprice.com/press/).

14      SeekingMillionaire.com.  SeekingMillionaire.com—an InfoStream-owned

15  website which purports to be "the leading Wealthy Member dating site where over

16  5+ million members fuel mutually beneficial relationships on their own terms"—

17  has similarly been the focus of rampant media and public interest.  Ex. 15

18  (https://seekingmillionaire.com/).

19  • *SF Gate*: "[T]he bluntly named SeekingMillionaire.com . . . offers

20     'Indecent Proposal'-class interactions for the legitimately wealthy

21     looking to turn cold cash into, er, hot assets." Ex. 28.

22  • *CBS News*: "[F]inding the golden goose, or gander, is getting easier.

23     Or at least more direct. There are a number of Internet sites that allow

24     subscribers to meet the rich. One, called seekingmillionaire.com, is

25     actually free for the millionaire-seekers, as long as they're good

26     looking, according to founder Brandon Wade." Ex. 21.

27      Courts frequently strike claims where the challenged speech or conduct

28  concerns an issue that has attracted widespread media attention.  For instance, in

*Global Telemedia*, defendants posted negative messages on an internet bulletin board concerning plaintiff, a publicly traded telecommunications company, and plaintiff sued for libel, and interference with contractual relations and prospective economic advantage.  Defendants moved to strike the complaint under the anti-SLAPP statute, arguing that the suit was "a transparent effort to intimidate individuals who were critical of plaintiff's corporate performance."  132 F. Supp. 2d at 1261.  This Court held that the case concerned an issue of "public interest" because, like InfoStream here, plaintiff had "inserted itself into the public arena and made itself a matter of public interest by means of numerous press releases" and was "the topic of literally tens of thousands of internet postings."  *Id*. at 1265.[11]  Likewise here, the numerous publications, articles, television appearances, press releases, and books concerning InfoStream, Mr. Wade, and their dating websites demonstrate and support that this case concerns a matter of public interest.

### B.  InfoStream Cannot Establish A Reasonable Probability of Prevailing On Its Breach of the Implied Covenant Claim.

Nor can InfoStream satisfy its burden of proving that it is reasonably likely to prevail in this case.  InfoStream alleges that Sirius XM wrongfully "terminat[ed] its relationship with InfoStream" based on the "pretextual" reason that InfoStream was "perceived to be offering escort services."  FAC ¶¶ 8-9.  Specifically, InfoStream asserts that Sirius XM was contractually "bound to broadcast InfoStream's radio advertisements" but "amended its Standards and Practices . . . to create a means

---

[11] *See also Roe*, 2009 WL 1883752, at *7 (public interest "evidenced by multiple [news] articles referencing the contract dispute, including several articles containing quotes from [the parties] commenting on the dispute," as well as by the "broadcasting of [defendant's] statements" on a radio show); *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 650-51 (1996) (public interest established where plaintiff had received significant "media coverage"); *Ingels v. Westwood One Broadcasting Services, Inc.*, 129 Cal. App. 4th 1050, 1056 (2005) (radio broadcasts concerning "relationships and dating between men and women" involved a matter of public interest); *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 110 (2007) ("[A] matter of public interest should be something of concern to a substantial number of people.").

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

through which it could attempt to legitimize the termination of its relationship with InfoStream" and thereby "intentionally and in bad faith breached the covenant of good faith and fair dealing *by denying InfoStream the benefits to which it was entitled under the Advertising Agreements*." *Id*. at ¶¶ 28, 31-32 (emphasis added). InfoStream's claim fails as a matter of law.

*First*, Sirius XM has not "den[ied] InfoStream the benefits to which it was entitled" because, as InfoStream knows, there is no operative contract between the parties. As previously explained, between September 2011 and May 2014, Sirius XM entered into a series of short-term, standalone written agreements with InfoStream's purported agent, RadioActive. Each of the Agreements contained a set contractual term—as defined by the "start" and "end" dates, and typically comprising a four to six week period—and identified the specific dates and Sirius XM channels on which InfoStream's commercials were to air. But the last of the parties' Agreements ended on June 29, 2014, nearly three years ago. In addition, and as confirmed by the Affidavits provided to InfoStream and the declaration of Alice McNamara, all of the InfoStream commercials contracted for aired on Sirius XM's satellite radio channels long ago. McNamara Decl. ¶¶ 7, 9; Exs. 5-8. Put simply, Sirius XM could not have "wrongfully terminated" the Agreements because it fully performed under those contracts and the Agreements expired many years ago.[12] *See Kaliterna v. Wright*, 94 Cal. App. 2d 926, 936 (1949) (no breach where party "fully performed" under the contract); *Hodges v. Apple, Inc*., 640 Fed. Appx. 687, 689 (9th Cir. 2016) ("[plaintiff]'s contract-based claims fail because there has been no breach" where what defendant promised "is exactly what [plaintiff] received"); *United of Omaha Life Ins. Co. v. Bukenya*, 2013 WL 12120141, at *3 (C.D. Cal. Aug. 19, 2013) (where party "fully performed under the [a]greements,"

---

[12] InfoStream's recent withdrawal of its breach of contract claim further demonstrates that Sirius XM has not violated the terms of the Agreements. *Compare* Doc. 1-1 (alleging breach of contract claim), *with* Doc. 15 (omitting contract claim).

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

breach of contract claim necessarily fails); 1 Witkin, Summary 10th Contracts § 847 (2005) (breach of contract requires showing "the unjustified or unexcused[] failure to perform a contract"); *Santandrea v. Siltec*, 56 Cal. App. 3d 525, 528 (1976) (affirming dismissal of contract claim because "there was no contract and therefore no breach").

Moreover, InfoStream cannot contend that Sirius XM was required to continue broadcasting InfoStream's advertisements after expiration of the Agreements.  For example, the Agreements contain no "right of renewal" provisions, nor do they provide InfoStream with the contractual option to enter into future agreements.  *See* Rockmore Decl. ¶¶ 4-6, Exs. 1-3; *see also Charpentier v. Los Angeles Rams Football Co. Inc.*, 75 Cal. App. 4th 301, 309-11 (1999) (affirming demurrer of breach of contract claim where contract did not grant plaintiff a right of renewal or option).  Likewise, nothing in the Guide legally compels Sirius XM to continue broadcasting InfoStream's advertisements after the Agreements ended.[13]  As explained above, the Guide is a "statement of policy" containing internal guidelines for Sirius XM's advertising sales team to help ensure that all advertisements comport with the "sensibilities and values of all parts of the Sirius XM community."  Rockmore Decl. ¶ 7; Ex. 4 at 1; *see also id.* ("Although no statement of policy can cover all potential questions that may arise in making decisions regarding advertising content aired on Sirius XM, employees should remain aware of the importance of respecting the sensibilities and values of all parts of the Sirius XM community.").  Put differently, the Guide is *not* a contract between Sirius XM and InfoStream.  It contains none of the hallmark attributes of a contract—including evidence of an offer, acceptance, or consideration—and cannot

---

[13] To the contrary, the Guide expressly states that Sirius XM "is not obligated to accept any advertising; and may in its sole discretion determine not to air an ad, or to pull from its schedule an ad which has already begun its scheduled run."  Ex. 4 at 4.  *See also id.* at 2 (Sirius XM reserves the right to "[r]eject advertising where, in the view of Sirius XM, the advertised product . . . or service . . . could negatively impact Sirius XM or its audiences in any way.").

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

give rise to an obligation for Sirius XM to "exercise [its] discretion honestly across its advertisers and in good faith" as InfoStream claims.  FAC ¶ 6.  In addition, Sirius XM is not a "common carrier," and thus has no obligation to allow "members of the public" to "transmit [content] of their own design and choosing." *FCC v. Midwest Video Corp.*, 440 U.S. 689, 702 (1979); *see also* 23 FCC Rcd 12348, at *12396 n.335 (2008) (FCC:  "We reject . . . [the] proposed condition to place [Sirius XM] under . . . . common carrier regulation."); 47 U.S.C. § 153(11) ("[A] person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.").

The lack of any extant contract between the parties is fatal to InfoStream's breach of the implied covenant claim.  As this Court has observed, "in order for a breach of implied covenant of good faith and fair dealing claim to survive, *there must be an underlying contract.*"  *Hibu Inc. v. Lawrence*, 2013 WL 6190538, at *4 (C.D. Cal. Nov. 25, 2013) (Carter, J.) (dismissing breach of implied covenant claim where plaintiff failed to allege any "specific contractual obligation . . . giv[ing] rise" to implied covenant claim) (emphasis added).  Absent any contractual obligation to air InfoStream's commercials, Sirius XM could not have breached the implied covenant of good faith and fair dealing.  *See Xin Liu v. Amway Corp*., 347 F.3d 1125, 1138 (9th Cir. 2003) ("[Plaintiff's] covenant of good faith and fair dealing claim also fails[] because there [is] no contract . . . to support the covenant."); *Van Ness v. Blue Cross of California*, 87 Cal. App. 4th 364, 376 (2001) ("There can be no breach of [implied] covenant where, as here, a valid, unambiguous contract has been fully performed in accordance with its terms."); *Nygard*, 159 Cal. App. 4th at 1046 ("Because we have concluded that Timo's disclosures did not breach the express terms of the confidentiality provision of the employment contract, we necessarily conclude that they also did not breach the implied covenant of good faith or the duty of loyalty."); *Agosta v. Astor*, 120 Cal. App. 4th 596, 607 (2004) ("The [implied] covenant 'cannot impose substantive

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

1  duties or limits on the contracting parties beyond those incorporated in the specific

2  terms of their agreement.'"), *quoting Guz v. Bechtel Nat. Inc*., 24 Cal. 4th 317, 349-

3  350 (2000).

4      InfoStream also cannot prevail because its implied covenant claim is

5  predicated on Sirius XM's purported wrongful termination of the Agreements.

6  California law is clear that to recover for breach of the implied covenant,

7  InfoStream must establish "something beyond breach of the contractual duty itself."

8  *Progressive W. Ins. Co. v. Yolo Cnty. Super. Ct*., 135 Cal. App. 4th 263, 277

9  (2005).  *See also Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Group*, 143

10  Cal. App. 4th 1036, 1041 (2006) (plaintiff cannot "recover in tort for the breach of

11  duties that merely restate contractual obligations"); *Bionghi v. Metro. Water Dist. of*

12  *So. Cal*., 70 Cal. App. 4th 1358, 1370 (1999) (dismissing implied covenant claim as

13  "duplicative" and "superfluous" because it "relie[d] on the same acts, and seeks the

14  same damages" as breach of contract claim); *BFGC Architects Planners, Inc. v.*

15  *Forum/Mackey Constr., Inc*., 119 Cal. App. 4th 848, 853 (2004) (same); *Koehrer*

16  *v. Superior Court*, 181 Cal. App. 3d 1155, 1169-71 (1986) (same).  InfoStream

17  does not come anywhere close to satisfying this standard.

18      *Second*, Sirius XM did not adopt the standards and practices in the Guide as a

19  "pretext to prematurely terminate its contract with InfoStream" or to "legitimize the

20  termination of its relationship with InfoStream."  FAC ¶¶ 32-33.  As discussed

21  above, Sirius XM did not need an excuse to terminate the Agreements—those

22  contracts had already expired by their own terms.  In addition, Sirius XM drafted

23  the Guide as part of an independent review of its business practices, and to provide

24  guidance and clarity to its employees for purposes of decision-making on the many

25  different types and categories of radio advertisements.  Rockmore Decl. ¶¶ 7-8, Ex.

26  4.  Nothing in that 15-page document suggests that Sirius XM drafted the Guide to

27  specifically target InfoStream or to justify its decision not to broadcast InfoStream's

28  controversial advertisements.

*Third*, InfoStream's assertion that Sirius XM applied the Guide standards "unevenly" and allowed "others in similar businesses to continue to advertise" is both wrong and beside the point.  FAC ¶¶ 1, 9.  Sirius XM is not a government agency or common carrier and has no obligation to broadcast *any* InfoStream advertisement whatsoever.  Nor is Sirius XM obligated to promulgate an internal Guide to advertising, or to apply such standards "evenly."  *See* discussion, *infra*.

Moreover, InfoStream is wrong that Sirius XM continues to advertise for an "escort  business" after "terminating its relationship with InfoStream."  FAC ¶ 8.  InfoStream presumably is referring to Ashley Madison.com—a different online dating website whose advertisements Sirius XM has previously broadcast and against whom InfoStream has frequently litigated.  *See InfoStream Group, Inc. v. Avid Life Media, Inc*., Case No. 2:10-cv-05166-VBF-FMO (C.D. Cal.), Doc. 1; *Avid Life Media, Inc. v. InfoStream Group, Inc*., Case No. 2:12-cv-09315-DDP-AJW (C.D. Cal.), Doc. 1.  But Ashley Madison is not an "escort service" at all, nor do members pay women to go on dates with them, as is the case with InfoStream's services.  Instead, Ashley Madison is a traditional dating website, like Match.com, for people who are in relationships and looking to have a discreet relationship with others who are also in relationships.  There is no commercial exchange between the daters.  *See* Ex. 20 (https://www.ashleymadison.com/?reg=1) (noting that "Ashley Madison is the best place to find real, discreet relationships with open-minded adults").[14]  That distinction makes the difference under Sirius XM's internal standards and practices set forth in the Guide.

---

[14] By contrast, InfoStream—which admittedly offers "services where any person is compensated to participate in the date" and "mutually beneficial relationship[s]"—falls squarely within the Guide's definition of proscribed advertising. Ex. 4 at 9. As InfoStream admits, Sirius XM "could refuse to broadcast advertisements that did not comply with [the Guide]." FAC ¶ 5.

SIRIUS XM'S ANTI-SLAPP MOTION
CASE NO. 8:17-CV-00253-DOC (KES)

## IV.   ALTERNATIVELY, THE COURT SHOULD STAY THIS CASE.

If this motion is denied, Sirius XM requests that the Court stay this action pending resolution of Sirius XM's interlocutory appeal.  The anti-SLAPP statute expressly provides that the moving party can immediately appeal an order denying a motion to strike.  *See* Cal. Code Civ. Proc. § 425.16(i).  Federal courts have also adopted this approach.  *See DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009, 1015 (9th Cir. 2013) ("[T]he denial of a motion to strike made pursuant to California's anti-SLAPP statute remains among the class of order for which an immediate appeal is available."); *Batzel v. Smith*, 333 F.3d 1018, 1025-26 (9th Cir. 2003) ("Without [the right of immediate appeal], a defendant will have to incur the cost of a lawsuit before having his or her right to free speech vindicated.") (citations omitted); *Makaeff* v. *Trump University, LLC*, 2011 WL 613571, at *2 (S.D. Cal. Feb. 11, 2011) (same).  Where, as here, the only cause of action in the FAC is subject to an anti-SLAPP motion, the case should be stayed in its entirety pending resolution of any appeal by Sirius XM.  *See Future Ads LLC v. Gillman*, 2014 U.S. Dist. LEXIS 40398, at *2 (C.D. Cal. Mar. 24, 2014) (Carter, J.) (granting stay and noting that "[w]hen a denial of an anti-SLAPP motion as to a particular claim is appealed, most district courts counsel a stay of all proceedings related to that claim").

## V.   CONCLUSION

For all the foregoing reasons, Sirius XM respectfully requests that the Court grant the instant motion and strike InfoStream's FAC.  Alternatively, the Court should stay all proceedings pending Sirius XM's appeal.

Dated:  April 24, 2017          O'MELVENY & MYERS LLP

By:   /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Sirius XM Radio Inc.